SMITH *v.* STATE.

4183                                        143 S. W. 2d 190

Opinion delivered September 30, 1940.

■■■■

---

[11] The record consists of the petition and letters of administration.

Appeal from Polk Circuit Court; *Minor W. Millwee,* Judge; reversed.

*George Edwin Steel* and *George R. Steel,* for appellant.

*Jack Holt,* Attorney General, and *Jno. P. Streepey,* Assistant Attorney General, for appellee.

MEHAFFY, J. Appellant was charged in an information filed by the prosecuting attorney with assault with intent to kill. Appellant filed a statement alleging that he was not guilty of the crime charged against him, by reason of insanity.

On January 15, 1940, the judge of the circuit court committed him to the state hospital for a period of thirty days for observation and investigation as to his sanity at the time of the alleged commission of the crime, and at the present time.

The appellant filed a motion for continuance on account of the absence of a material witness for the defense. The motion for continuance was overruled, appellant was tried and convicted, and his punishment fixed at one year in the penitentiary.

Motion for new trial was filed and overruled, and the case is here on appeal.

Guy Fulsom, a witness for the state, testified in substance that he went down to see some parties on October 28th, and appellant was there; witness arrived there about 7:30 and remained there until 3:30 in the afternoon; appellant was there when witness left; they played cards; appellant was in the game, and after the game was over and witness started to leave appellant called to him and told him he guessed they had better settle their little difference; witness told him he did not know they had any, and about that time appellant hit witness with his fist; witness then hit appellant and knocked him to his knees and threw him down, but told him if he would go and act like a man he would

give him what money he had; he was talking about the money lost in the game; when witness went down there he had $3.50, and when he left, $6.75; appellant said if witness would let him up he would go on; witness turned him loose and handed him $6.75; when witness looked back appellant was on him with a knife and he ran off; appellant had had a drink or two and witness had taken two drinks; saw appellant about an hour later; he was standing by witness' gate by a tree; heard a gun shot and then heard appellant talking; he was 23 feet from the door; witness' wife went to the window and told appellant that if he would go on she would give him what money they had, and he said he had all the money he wanted, but he was going to kill witness; pulled the trigger and the shot hit the wall on the other side of the baby's crib; he fired two shots; after witness's wife talked to him he shot again; had never had any difficulty with appellant before; had known him about six months, but did not know his mental condition; five parties had been in the poker game; all of them had drunk some liquor; appellant was not drunk and had no cause to be mad at witness; witness gave appellant back the merchandise order and appellant wanted to play it all at once; witness walked off; appellant was not in good humor because witness would not play $16 at one time; does not know whether appellant knew that witness was in his house or not; witness was never convicted of anything in Polk county, though he did submit and pay a fine for being drunk.

Mrs. Guy Fulsom testified to substantially the same facts that were testified to by Guy Fulsom.

Olan Oglesby testified in substance that the parties were playing poker and pitch and he saw trouble from a distance of 50 yards; afterwards saw appellant in the road with a shotgun; shot at the house where witness lived; later heard three gun shots in the direction of .Fulsom's house; knew it was appellant and witness went down the road to Fulsom's; heard three shots; heard Fulsom tell appellant he would give appellant his money if he would leave him alone and they got in a fight.

Several other witnesses testified about the shooting by appellant, and appellant introduced evidence showing that he had been committed for insanity and· also evidence that relatives had been insane, and evidence of physicians who testified to his insanity.

In rebuttal the state introduced Dr. Frank Englar assistant physician on the staff of the Arkansas State Hospital; examined the appellant on numerous occasions and presented him before the staff composed of six doctors for his final diagnosis; they diagnosed him, based on his history, as being without psychosis; that is, not insane; witness had the original file showing when appellant was admitted to the hospital; witness, however, was not at the hospital at the time and only knew what the record showed; it showed that he was in the hospital first in June, 1937, and paroled to his wife on July 15, 1937.

The official record of the hospital was introduced as an exhibit, over the objection of appellant; the record further showed that on October 6, 1937, he was readmitted and discharged on October 19, 1937; and was admitted to the hospital on January 16th of this year. The diagnosis made on the two former occasions and the record, shows that appellant was without psychosis. The case history of appellant made under provisions of Initiated Act No. 3, Acts 1937, p. 1384, when he was admitted to the hospital in January, 1940, was offered in evidence. Appellant objected to the introduction of this record, but his objection was overruled, and the court in overruling it instructed the jury that it could only consider the report in determining defendant's sanity or insanity at the time the crime was alleged to have been committed.

Dr. Englar further testified that it was his opinion that appellant was not suffering from paranoia.

The record that was introduced over the objection of appellant was not certified as required by law, and no physician who was present at, or had anything to do with, the examination testified. That report shows that

appellant was sane and two or three physicians stated in the report that he was a pathological liar.

The appellant asked reversal first because the court overruled his motion for a continuance on account of the absence of a witness.

The court did not err in overruling the motion for a continuance. It is the settled rule of this court that the question of a continuance is one resting in the sound discretion of the trial court and its action will not be disturbed on appeal unless there is shown a clear abuse of discretion. *Taylor* v. *State,* 193 Ark. 691, 101 S. W. 2d 956; *Martin* v. *State,* 194 Ark. 711, 107 S. W. 2d 676.

Appellant urges, however, that the introduction of the report containing statements of physicians and others was violative of the constitution. Appellant's defense was based on insanity. He filed a statement that he was insane and the statements in the report of the hospital, without being certified to by anybody and without the witnesses being called to testify, was introduced for the purpose of showing that he was sane.

It is a fundamental rule of the English common law, embodied in both the state and federal constitutions as a part of the declaration of rights, that in all criminal prosecutions the accused shall have and enjoy the right to be confronted by the witnesses against him. To be confronted by the witnesses against him does not mean merely that they are to be made visible to the accused, so that he shall have the opportunity to see and to hear them, but it imports the constitutional privilege to cross-examine them. The right of cross-examination is a substantive right, and a most valuable and important one. By it the accused can test the interest, prejudice, motive, knowledge, and truthfulness of the witness, and nothing can be substituted for this right of cross-examination.

It has been said: "The object of this constitutional provision 'is to guard the accused in all matters the proof of which depends upon the veracity and memory of witnesses, against the danger of falsehood or of mistake, by bringing the witnesses, when they give their

testimony as to such matters, face to face with him.' "
*State* v. *Frederic,* 69 Me. 400.

The constitutional right of confrontation is preliminary to, and but another name for, the right of cross-examination. The object of the constitutional provision is to protect appellant against adverse testimony from whatever source it may come. It is not a mere privilege to be granted or withheld at the discretion of the court, but a substantive right possessed by the accused, and while the court may, in the exercise of reasonable discretion, limit the scope and extent of cross-examination, it cannot absolutely deny it to one entitled to it.

We are, therefore, of the opinion that in order to do justice and fully protect the rights of appellant he should be given the right to cross-examine these witnesses. *State of Maine* v. *Crooker,* 123 Me. 310, 122 Atl. 865, 33 A. L. R. 821.

The rule is stated in R. C. L. as follows: "It is a usual constitutional provision in the United States that a person on trial for a crime shall be confronted by the witnesses against him. . . . Confrontation in criminal law has been defined as the act of setting a witness face to face with the prisoner, in order that the latter may make any objection he has to the witness, or that the witness may identify the accused, and this must take place in the presence of the court having jurisdiction to permit the privilege of cross-examination. This right has always been deemed one of the most valuable safeguards of the citizen. It protects him against the peril of conviction by means of ex parte testimony or affidavits given in his absence or when he had not the right of cross-examination. It is generally agreed that the process of confrontation has two purposes—the main and essential one and a secondary one. The main and essential purpose of confrontation is to secure the opportunity of cross-examination. The opponent demands confrontation, not for the idle purpose of gazing on a witness or of being gazed on by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting

of questions and obtaining immediate answers. That this is the true and essential significance of confrontation is demonstrated by counsel and judges from the beginning of the hearsay rule to the present day. The opportunity to cross-examine must be real. A mere formal proffer of an opportunity, where the circumstances are such that the accused cannot effectively avail himself of it, is not a sufficient observance of the right. Then there is the secondary advantage to be obtained from the personal appearance of the witness. The judge and jury are enabled to obtain the elusive and incommunicable evidence of a witness's deportment while testifying, and a certain subjective moral effect is produced on the witness. This secondary advantage, however, does not arise from the confrontation of the opponent and the witness. It is not the consequence of those two being brought face to face. It is the witness's presence before the tribunal that secures this secondary advantage which might equally be obtained whether the opponent was or was not allowed to cross-examine." 8 R. C. L., p. 84, *et seq.*

It was error to permit the introduction of the report of the hospital and the statements contained therein without the witness being present and appellant given the opportunity to cross-examine them.

We find no other error, but for the error indicated; the judgment is reversed and the cause remanded for new trial.